The Honorable Ricardo Martinez

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| DOMINIQUE STEWART, an individual,<br><br>                  Plaintiff,<br><br>     v.<br><br>WASHINGTON STATE UNIVERSITY, a state education institute,<br><br>                Defendant. | NO.  18-cv-00557<br><br>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>NOTE ON MOTION CALENDAR: FRIDAY, JANUARY 25, 2019 |

## I.    RELIEF REQUESTED

Defendant Washington State University moves for summary judgment of dismissal.

## II.    NATURE OF THE CASE

This is a civil rights action. Plaintiff Dominique Stewart alleges sex discrimination pursuant to 20 U.S.C. § 1681 ("Title IX"), and race discrimination pursuant to 40 U.S.C. § 2000d ("Title VI").[1] She also alleges a private right of action under The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("the Clery Act"), 20 U.S.C. § 1092, 34 C.F.R. 668.46, and common law negligence and outrage.[2] Plaintiff's theory of the case is that

---

[1] Dkt. 3 (Amended Complaint), pp. 7:5-9:11.
[2] *Id.*

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

1

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

the University "did not provide reasonable action or assistance as required by Title VI and Title IX" following two incidents of peer-on-peer verbal racial and sexual insult.[3]

### III.    SUMMARY OF THE ARGUMENT

To prove a claim arising out of peer-on-peer discrimination under either Title VI or Title IX, a plaintiff must prove the institution was "deliberately indifferent" to the effects of the discrimination.[4] Here, Plaintiff fails to present such evidence. To the contrary, the evidence shows the University provided immediate, responsible and comprehensive support to Plaintiff.

Plaintiff fails to state a private right of action under the Clery Act, which is enforced by the United States Department of Education, not private citizens.[5] Even if Plaintiff had a private right of action, however, there is no evidence the University failed to meet its Clery Act obligations.[6]

Because Plaintiff has no viable federal claims, her common law claims of negligence and outrage may be dismissed. If the court rules on these common law claims, however, it should dismiss them on the merits. Plaintiff fails to state a claim for negligence because she does not identify a legal duty owed specifically to her that the University breached which proximately caused her damages. Plaintiff fails to state a claim for outrage because no reasonable juror could conclude the University's response to the two incidents of discrimination she experienced was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[7]

### IV.    EVIDENCE RELIED UPON

The University relies upon the Declarations of Paul Triesch, Melynda Huskey, Jeff Guillory, Gary Jenkins and Steve Hansen, the exhibits appended thereto, and the argument herein.

---

[3] Dkt. 3, p. 6:22-23.

[4] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999).

[5] *See* 20 U.S.C. §1092(f)(14)(A) ("Nothing in this section may be construed to create a cause of action against any institution of higher education or any employee of such an institution for any civil liability....")

[6] Hansen Dec.

[7] *Dicomes v. State*, 113 Wash. 2d 612, 630, 782 P.2d 1002 (1989) (quoting *Grimsby v. Samson*, 85 Wash. 2d 52, 59, 530 P.2d 291 (1975)).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

2

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

# V. STATEMENT OF FACTS

Plaintiff Dominique Stewart[8] was a student at the University from Fall semester 2014 to Spring semester 2018.[9] She is African-American.[10] At approximately 2:30 a.m. on Sunday, February 22, 2015,[11] a Caucasian male student at Phi Delta Theta fraternity, which is located outside the University's Pullman campus, twice insulted Dominique with racial and sexual epithets.[12] Dominique telephoned her mother, Jameila Stewart, about the incident and later spoke about it with Christina Sessoms, the President of the University's Black Student Union.[13] She does not recall reporting the incident to anyone in the University's administration.[14]

On Monday, February 23, 2015, Dominique met with members of the Phi Delta Theta fraternity and identified the offending fraternity member, whose membership in the fraternity was immediately terminated.[15] The offending student asked to meet with Dominique, which Dominique declined, then sent her a lengthy text message stating his regret and apology.[16]

By Tuesday, February 24, 2015, the University's Interim Vice President for Student Affairs, Melynda Huskey, had learned of the incident.[17] Dr. Huskey immediately assembled an Incident Response Team comprised of numerous University officials, including Dr. Huskey; Brian Shuffield, Executive Director for Student Involvement; Evan Englander, Assistant Director for the Center for Fraternity and Sorority Life; Turea Erwin, Director of the Women's Resource Center; Stephanie DeVore, attorney and Equal Employment Opportunity Coordinator/Title IX

---

[8] To promote clarity, the Statement of Facts hereafter identifies Plaintiff Dominique Stewart as "Dominique" and identifies her mother, Jameila Stewart, as "Jameila." No disrespect is intended.
[9] Triesch Dec., Ex. 1 (Dominique Stewart deposition excerpts), pp. 10:3-14, 168:14-24.
[10] Dkt. 3, p. 3:5.
[11] Dominique alleges the incident occurred at 2:30 a.m. on either Saturday, February 21 or Sunday, February 22, 2015. Triesch Dec., Ex. 1, p. 28:12-29:9.
[12] Huskey Dec., Ex. 13 (Investigation Report); Dkt. 3, p. 3:6-10.
[13] Triesch Dec., Ex. 1, pp. 32:15-33:25; 36:2-12.
[14] Id., pp. 44:23-46:19.
[15] Id., pp. 39:10-20; 48:7-24; Huskey Dec., Ex. 13.
[16] Triesch Dec., Ex. 1, p. 84:14-25, 124:21-125:3; Huskey Dec., Ex. 13, pp. PLTF_000004-000005.
[17] Huskey Dec.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)

3

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

Investigator; Donna Arnold, Associate Director of the SMART START Program/Retention Counselor and African American Student Center; J. Manuel Acevedo, Director of the Office of Multicultural Student Services; Melissa Morgan, Assistant Dean of Students for the Division of Student Affairs; Kimberly Anderson, attorney and Executive Director for Compliance, Title IX Coordinator and ADA Coordinator;  Adam Jussel, Director of the Office of Student Conduct; and Karen Fischer, Associate Dean of Students for the Division of Student Affairs.[18]

Dr. Huskey informed the Incident Response Team that the University's Office for Equal Opportunity (OEO) and Office of Student Conduct would investigate the incident.[19] She also facilitated a meeting between Sessoms, the Phi Delta Theta fraternity president, Arnold and other University administrators, acknowledged and supported a silent rally prompted by the incident scheduled for the following day, and detailed future actions the University would take, including notifying the student newspaper of the silent rally and making herself and other University administrators available to respond to any student concerns.[20]

That day, Evan Englander contacted the Director of Chapter Services for Phi Delta Theta, who responded with "immediate sanctions for the fraternity."[21] Englander also met with the University's Interfraternity and Panhellenic Councils to discuss steps they might take.[22] The Councils published a condemnation of the offending student's conduct that day.[23] Dr. Huskey encouraged the Center for Fraternity & Sorority Life to inform Jameila of its actions.[24]

The University's Center for Fraternity & Sorority Life later imposed a sanction on Phi Delta Theta that required the fraternity to host a mandatory diversity/sensitivity workshop conducted by a University official and that compelled fraternity members to undergo bystander

---

[18] Huskey Dec., Ex. 1 (February 24, 2015 email).
[19] Id.
[20] Id.
[21] Huskey Dec., Ex. 2 (February 24 and 25, 2015 email chain).
[22] Id.
[23] Huskey Dec., Ex. 3 (February 24, 2015 Greek Council Statement).
[24] Huskey Dec., Ex. 8 (March 5 and 6, 2015 email chain).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

4

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

intervention training through the University's Health and Wellness Center.[25] The deadline for completion of those two sanctions was the end of Spring semester 2015.[26] On March 10, 2015, Guillory personally conducted the diversity/sensitivity workshop at Phi Delta Theta.[27]

On February 25, 2015, approximately 100 students, including Stewart, held a one-hour silent rally on campus to raise awareness about "racism, classism, sexism, ableism, gender discrimination, religious discrimination, etc…"[28] Members of the Phi Delta Theta fraternity joined the silent rally, as did Dr. Huskey.[29] The University's police facilitated the rally.[30]

On February 26, 2015, OEO investigator, Stephanie DeVore, wrote to Dominique regarding a conversation they had earlier that day about the incident.[31] DeVore invited Dominique to contact her to discuss the incident and provided Dominique her direct telephone number.[32] Dominique was aware DeVore was "going to be the investigator of the incident."[33]

On March 2, 2015, Dr. Huskey met with Dominique and Jameila.[34] At that meeting, Jameila requested that the University provide Dominique a new dormitory room closer to the Student Recreation Center and her classes.[35] Dr. Huskey agreed to do so.[36] That day, Dr. Huskey determined the University had two vacancies that met Dominique's criteria and informed Jameila of their availability.[37] Dr. Huskey requested the University's Director of Residence Life, Edwin Hamada, make a staff member available to Jameila and Dominique to show them the available rooms and answer any questions they might have.[38] Hamada did so.[39]

---

[25] Huskey Dec.
[26] Id.; Guillory Dec.
[27] Guillory Dec.; Triesch Dec., Ex. 1, p. 159:12-15.
[28] Triesch Dec., Ex. 1, pp. 60:18-62:24, 74:16-21 and Dep. Exs. 5, 6 and 7.
[29] Id., p. 68:6-17 and Dep. Ex. 10; Huskey Dec.
[30] Gardner Dec.
[31] Triesch Dec., Ex. 1, pp. 80:4-81:22 and Dep. Ex. 13.
[32] Id.
[33] Id. and pp. 118:22-119:18, 152:13-22 and Dep. Ex. 18.
[34] Huskey Dec.
[35] Id.
[36] Id.
[37] Id., Ex. 5 (March 2, 2015 text messages).
[38] Huskey Dec.
[39] Id.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

5

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

On March 5, 2015, Dr. Huskey provided Dominique and Jameila with a written resource guide detailing numerous available sources of University assistance to address any effects of the February 22 incident.[40] Those resources included counseling and testing services, health and wellness services, accommodation services, and emergency and police services.[41]

Dr. Huskey also provided Dominique the names of two additional University officials who could furnish her with direct, ongoing and personal support: Donna Arnold, the Director of the University's African-American Student Center, and Karen Fischer, the University's Associate Dean of Students.[42] Dr. Huskey ensured that Arnold could meet with Dominique and provide perspective and support.[43] Thereafter, Dominique had "a couple of" meetings with Arnold.[44] Dominique also met with Dean Fischer "a couple of times."[45]

On March 29, 2015, an unidentified male in a vehicle occupied by three other unidentified males insulted Dominique with a racial and sexual epithet and threw a chicken nugget at her.[46] This incident occurred at an off-campus location over which the University had no jurisdiction, but the University's police department nevertheless ensured that the Pullman police department was aware of it.[47] The Pullman police department contacted Dominique, but she could not identify the individuals in the vehicle as students or otherwise, and she could not provide a license plate number for the vehicle.[48] The Pullman police department located a vehicle that matched the vehicle Dominique described, but determined after investigation the individuals associated with the vehicle were not involved in the March 29 incident.[49]

---

[40] Huskey Dec., Ex. 6 (March 5, 2015 email); Triesch Dec., Ex. 1, p. 89:2-25 and Dep. Ex. 15.
[41] Id.; Triesch Dec., Ex. 1, pp. 92:7-93:1, 94:23-95:25.
[42] Id.
[43] Huskey Dec.; Triesch Dec., Ex. 1, pp. 105:5-8, 106 18-22.
[44] Triesch Dec., Ex. 1, pp. 108:25-109:7, 154:10-13.
[45] Triesch Dec., Ex. 1, pp. 105:5-8, 106 18-22, and 108:19-24.
[46] Dkt. 3, p. 5:1-4; Triesch Dec., Ex. 1, p. 99:12-16.
[47] Gardner Dec.; Huskey Dec.
[48] Id.; Triesch Dec., Ex. 1, pp. 144:7-20, 145:22-146:17.
[49] Gardner Dec.; Huskey Dec., Ex. 9 (March 30, 2015 email).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)

6

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

On March 30, 2015, Dr. Huskey notified Dominique that the University's President, Elson Floyd, asked to meet with Dominique and the other women present at the Phi Delta Theta fraternity on February 22.[50] That meeting occurred on April 2, 2015.[51] President Floyd and Jeff Guillory, both of whom are African-American men, met with Dominique and the other women and assured them of the University's support.[52] President Floyd gave Dominique and the other women his cell phone number and told them that he would be available to assist them at any time they needed.[53] At Jameila's request, Dominique surreptitiously recorded that meeting.[54]

Also on April 2, 2015, Dr. Huskey met with Jameila, Dominique, Arnold, Fischer, J. Manuel Acevedo, Bill Gardner, the University's Chief of Police, and Marc Robinson, the University's Director of Cultural and Heritage Houses.[55] Dominique does not "remember exactly everyone who was there, but … there was, like, a good amount of people."[56] During that meeting, Jameila and Dominique inquired about the investigation of the March 29, 2015 incident.[57] Chief Gardner provided them contact information for the Pullman police department and informed them that he would be available to discuss on-campus safety planning with Dominique whenever she wished.[58] Neither Dominique nor Jameila ever contacted Chief Gardner, or anyone in the University's police department, to engage in safety planning.[59]

During that April 2 meeting, Jameila asked Chief Gardner to provide Dominique with personal 24-hour police security.[60] Chief Gardner advised Jameila that the University did not

---

[50] Huskey Dec., Ex. 9; Guillory Dec.; Triesch Dec., Ex. 1, pp. 96:3-97:5 and Dep. Ex. 16.
[51] Guillory Dec.; Triesch Dec., Ex. 1, pp. 98:22-99:11, 154:22-155:1; Elson Floyd passed away in June 2015. *See* https://www.seattletimes.com/seattle-news/education/elson-floyd-wsu-president-dies/; FRE 201(b)(2).
[52] Guillory Dec.
[53] *Id*.
[54] Triesch Dec., Ex. 1, pp. 131:15-133:11.
[55] Huskey Dec., Exs. 10-12. Robinson was attended the meeting on Guillory's behalf. *Id*.
[56] Triesch Dec., Ex. 1, pp. 109:8-110:1.
[57] Huskey Dec.; Gardner Dec.
[58] *Id*.
[59] Gardner Dec.
[60] *Id*.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)

7

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

have the resources to provide Dominique personal 24-hour police security, but that the police would coordinate with any private security Jameila and Dominique might retain.[61]

At the conclusion of that April 2 meeting, Dr. Huskey again provided Jameila and Dominique written referral information for the Student Counseling Center, Health and Wellness Center, Access Center, Campus Police Department, and Multicultural Student Services.[62] Dominique twice used counseling services and also used health and wellness services.[63]

After the April 2, 2015 meeting, President Floyd authorized Guillory to hire DaVina Hoyt to support and provide leadership development opportunities to Dominique and the other women who were present at the fraternity on February 22.[64] Dr. Hoyt is an African American female.[65] Dr. Hoyt went to Dominique's dorm room to introduce herself to Dominique after she was hired.[66] Dominique had "a lot" of conversations with Dr. Hoyt in meetings "on campus."[67] In Spring 2015 and Spring 2016, Stewart attended out-of-state leadership conferences in Georgia with Dr. Hoyt, at the University's expense.[68]

On April 9, 2015, Dr. Huskey provided Dominique and Jameila with another written summary of resources available to Dominique to address any effects of the discrimination she experienced.[69] Dr. Huskey iterated that the "Pullman police department is investigating the incident on Colorado and B Street. Chief Gary Jenkins, who is the Pullman Police Chief, can be reached by phone at (509) 334-0802 or through his web site."[70] That day, the OEO completed its investigation, which concluded the student who had insulted Dominique on February 22 violated the University's policy prohibiting discrimination.[71] Dr. Huskey provided Dominique

---

[61] *Id.*
[62] Huskey Dec., Ex. 12 (April 9, 2015 email).
[63] Triesch Dec., Ex. 1, pp. 158:1-8
[64] Huskey Dec., Ex. 11 (April 6, 2015 email).
[65] Huskey Dec.
[66] Triesch Dec., Ex. 1, pp. 113:12-20.
[67] *Id.*, p. 114:5-24.
[68] *Id.*, pp. 114:25-118:4.
[69] Huskey Dec., Ex. 12.
[70] *Id.*; Triesch Dec., Ex. 1, p. 136:2-9 and Dep. Ex. 19.
[71] Huskey Dec., Exs. 13 (OEO Investigation Report) and 4 (Executive Policy Prohibiting Discrimination).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

8

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

with a copy of the investigation report.[72] Dominique admits she was aware after reading the report that the University concluded the student violated University policy.[73]

The OEO sent the report to the University's Office of Student Conduct.[74] On April 30, 2015, the Office of Student Conduct concluded the student who racially and sexually insulted Dominique on February 22 violated the University's student conduct standards.[75] The University then expelled him.[76] The student went through an appeals process and the University upheld the expulsion.[77] Dominique admits she was aware of the student's expulsion.[78]

Dominique graduated from the University in May 2018 with a 3.1 grade point average.[79] During her four years at the University, and following the incidents of February 22 and March 29, 2015, Dominique was involved in campus leadership as the Associated Students of Washington State University Diversity Director, as campus lead for Fun Run, Inc., and as the President and Founding Member of the Women's Empowerment Movement.[80] She also twice performed as a vocalist for up to a thousand University students in 2015 and again in 2016, in the "Shades of Black Show."[81] Dominique obtained her current job before her graduation.[82]

## VI.    STATEMENT OF ISSUES

1. Whether Plaintiff proves the University was "deliberately indifferent" to discrimination.

2. Whether Plaintiff has and can prove a private right of action under the Clery Act.

3. Whether Plaintiff proves the University had and breached a duty owed to Plaintiff alone.

4. Whether Plaintiff supplies evidence to prove outrage.

---

[72] Huskey Dec.; Triesch Dec., Ex. 1, pp. 121:18-123:8.
[73] Triesch Dec., Ex. 1, p. 129:9-15.
[74] Huskey Dec.
[75] *Id*.
[76] *Id*.
[77] *Id*. and Dep. Ex. 15.
[78] Triesch Dec., Ex. 1, pp. 129:22-130:9, 153:2-21, 157:11-16.
[79] *Id*., pp. 150:4-151:15, 168:25-169:25.
[80] *Id*., pp. 173:4-174:4, 175:12-22.
[81] *Id*., pp. 150:5-151:15.
[82] *Id*., p. 108:13-16.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

9

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1

## VII.   ARGUMENT AND AUTHORITY

2

### A.   Summary Judgment Standard.

3

Federal Rule of Civil Procedure 56(c) provides summary judgment shall be rendered "if

4

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

6

party is entitled to judgment as a matter of law."[83]  At the summary judgment stage, evidence

7

must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

8

are to be drawn in the nonmoving party's favor.[84]  An issue of fact is genuine only if there is

9

sufficient evidence for a reasonable jury to find for the nonmoving party.[85]  "The mere existence

10

of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could

11

reasonably find for the [nonmoving party]."[86]

12

### B.   Plaintiff Does Not Prove Her Title VI and Title IX Claims

13

Title VI (40 U.S.C. § 2000d) and Title IX (20 U.S.C. § 1681) parallel one another.[87]

14

Title VI prohibits race discrimination and Title IX prohibits sex discrimination.[88]  "The two

15

statutes operate in the same manner, conditioning an offer of federal funding on a promise by

16

the recipient not to discriminate."[89]  Title VI states "[n]o person in the United States shall, on the

17

ground of race, color, or national origin, be excluded from participation in, be denied the benefits

18

of, or be subjected to discrimination under any program or activity receiving Federal financial

19

assistance."[90]  Title IX states "no person in the United States shall, on the basis of sex, be

20

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

21

22

[83] Fed. R. Civ. P. 56(c).

23

[84] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

[85] *Id.* at 248-49.

[86] *Id.* at 252.

24

[87] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L.Ed.2d 277 (1998) (Title IX; teacher-on-student harassment); *Radcliff v. Landau*, 883 F.2d 1481, 1483 (9th Cir.1989).

25

[88] *Id.*

[89] *Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 599, 103 S. Ct. 3221, 3231, 77 L.Ed.2d 866 (1983).

26

[90] 42 U.S.C. § 2000d.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

10

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

any education program or activity receiving federal financial assistance."[91]

In cases that do not involve official policy of the recipient entity, a damages remedy only lies where an official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond."[92] Only when an education program receiving federal funds is "deliberately indifferent" to its students' right to a learning environment free of racial and sexual discrimination it is liable for damages.[93] Here, the question is whether a reasonable fact-finder could conclude the University's response was "clearly unreasonable in light of the known circumstances."[94] The Court decides whether, on this record, one could find that (the University) made "an official decision … not to remedy the violation."[95]

## 1.  Plaintiff Fails to Present Evidence Establishing a Title VI Violation

The Department of Education is the agency charged by Congress with enforcing Title VI, so its interpretation is entitled to a high degree of deference by the courts so long as it does not conflict with a clearly expressed congressional intent and it is reasonable.[96] According to the Department of Education, a school violates Title VI when (1) there is a racially hostile environment; (2) the school had notice of the problem; and (3) the school "failed to respond adequately to redress the racially hostile environment."[97] "Under this analysis, an alleged harasser need not be an agent or employee of the recipient because this theory of liability under

---

[91] 20 U.S.C. § 1681(a).

[92] *Gebser*, 524 U.S. at 290.

[93] *Id.*; *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 642, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999) (Title IX, peer-on-peer harassment); *Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (Title IX).

[94] *Oden*, 440 F.3d at 1089.

[95] *Id.* (citing *Gebser*, 524 U.S. at 290).

[96] *Monteiro v. The Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033  (9th Cir. 1998) (citing *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984)); *Williams v. Babbitt,* 115 F.3d 657, 660 n. 3 (9th Cir.1997) (noting *Chevron* deference is owed to agency interpretations made in adjudicative as well as regulatory context), *cert. denied,* 523 U.S. 1117, 118 S. Ct. 1795, 140 L.Ed.2d 936 (1998); *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801, 810 (9th Cir.1989) (deferring to agency interpretation contained in memoranda published in the Federal Register and rejecting argument that *Chevron* applies only to regulations).

[97] *Montiero*, 158 F.3d at 1033 (citing

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1 Title VI is premised on a recipient's general duty to provide a nondiscriminatory educational

2 environment."[98] This Court thus takes the three-part test set out by the Department of Education

3 in its *Interpretive Guidance* as the framework for evaluating whether Plaintiff may maintain a

4 claim for hostile racial environment under Title VI.[99]

5     The Department of Education defines a "racially hostile environment" as one in which

6 racial harassment is "severe, pervasive or persistent so as to interfere with or limit the ability of

7 an individual to participate in or benefit from the services, activities or privileges provided by

8 the recipient."[100] Racial harassment creates a hostile environment if it is sufficiently severe that

9 it would interfere with the educational program of a reasonable person of the same age and race

10 as the victim.[101] For this motion, the University concedes that an African American woman of

11 Plaintiff's age could find the two incidents of verbal racial and sexual insult Plaintiff experienced

12 might interfere with her educational program. The University also concedes for this motion that

13 the University had notice of the two incidents and that once the University was on notice, it had

14 "a legal duty to take reasonable steps to eliminate" the racially hostile environment.[102]

15     However, only if the evidence shows the University was "deliberately indifferent" to

16 Plaintiff's right to a learning environment free of racial hostility and discrimination it is liable

17 for damages under Title VI.[103] Under this standard, the University is liable for its failure to act

18 if the need for intervention was so obvious, or if inaction was so likely to result in discrimination,

19 that "it can be said to have been deliberately indifferent to the need."[104]

20     The evidence here does not establish deliberate indifference. Within days of the

21 February 22 incident, the University's Dean of Students and Vice President for the Division of

---

[98] *Id.*

[99] *Id.*

[100] *Montiero*, 158 F.3d at 1033 (citing 59 Fed.Reg. at 11449).

[101] 59 Fed.Reg. 11449; *see Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991) (holding that "reasonable person" in sexual harassment case brought by female plaintiff is a reasonable woman).

[102] 59 Fed.Reg. 11450.

[103] *Gebser*, 524 U.S. 274; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–92, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989).

[104] *Canton*, 489 U.S. at 390.

---

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

12

Student Affairs, Melynda Huskey, assembled an Incident Response Team comprised of University officials with expertise and authority covering a wide spectrum of University services.[105] The University's OEO and Office of Student Services investigated the incident, resulting in an OEO investigative finding that the offending student violated the University's policy prohibiting discrimination. The subsequent student conduct proceeding resulted in the student's expulsion from the University. The University affirmed that expulsion.

The University sanctioned the fraternity by requiring it to undergo University-sponsored training, supported and promoted on-campus activities directed toward raising awareness of discrimination, provided support resources to Plaintiff and her mother, and met with Plaintiff repeatedly to ensure she received assistance. The University's President met with Plaintiff, provided her his cell phone number, and assured her of the University's support. On this record, there is no evidence the University was "deliberately indifferent" to race discrimination.

### 2.    Plaintiff Fails to Present Evidence Establishing a Title IX Violation

To prevail under Title IX for peer-to-peer harassment, a plaintiff must prove: (1) the educational institution "exercise[d] substantial control over both the harasser and the context in which the known harassment [occurred];" (2) the harassment was so "so severe, pervasive, and objectively offensive" that it deprived the plaintiff of the educational opportunity or benefits of the institution; (3) the educational institution had "actual knowledge" of the harassment; and (4) the educational institutions "deliberate indifference" subjected the plaintiff to the harassment.[106] Again, for this motion, the University concedes it obtained actual notice of the two incidents of discrimination Plaintiff alleges and those two incidents could be construed as "sever and pervasive" discrimination that deprived her of educational opportunity. Again, there is no evidence in this record proving the University's deliberate indifference to sex discrimination.

The "deliberate indifference" standard requires proof that the University's "response to

---

[105] Huskey Dec.
[106] *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (citing *Davis*, 526 U.S. at 644-45).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

13

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

the harassment [was] clearly unreasonable in light of the known circumstances."[107] This is an "exacting standard"[108] that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless."[109] Rather, Plaintiff must prove the University made what amounts to "an official decision not to remedy the violation."[110] Moreover, the University's alleged "deliberate indifference" must have "subject[ed] [Plaintiff] to harassment," *i.e.*, "cause[d] [her] to undergo harassment or ma[d]e [her] liable or vulnerable to it."[111] In order to state a claim under Title IX, the University's response to the incidents must be "clearly unreasonable," amounting to "an official decision not to remedy the violation."[112]

In *Gebser v. Lago Vista Independent School District*,[113] the Supreme Court held that damages are available under Title IX only if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." The Court expressly declined to impose liability on "principles of *respondeat superior* or constructive notice," instead demanding actual notice to an official of the defendant.[114]

The *Gebser* Court then considered whether deliberate indifference to known acts of harassment amounts to an intentional violation of Title IX capable of supporting a private damages action when the harasser is a student.[115] The Court held that the language of Title IX itself—particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages—also cabins the range of misconduct that the statute proscribes. The statute's plain language confines the scope of prohibited conduct

---

[107] *Davis*, 526 U.S. at 643, 648.
[108] *Lopez v. Regents of Univ. of California*, 5 F.Supp.3d 1106, 1122 (N.D. Cal. 2013).
[109] *Oden*, 440 F.3d at 1089.
[110] *Id.* (internal quotation marks and alterations omitted); *accord Doe v. Willits Unified Sch. Dist.*, 473 Fed.Appx. 775, 776 (9th Cir. 2012).
[111] *Id.* at 645 (internal quotation marks omitted).
[112] *Oden*, 440 F.3d at 1089 (quoting *Davis*, 526 U.S. at 648, and *Gebser*, 524 U.S. at 290).
[113] 524 U.S. at 290.
[114] *Id.* at 285; *see also Davis*, 526 U.S. at 641 (reinforcing the holding of *Gebser*).
[115] *See Davis*, 526 U.S. 629.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)                                    14                    ATTORNEY GENERAL OF WASHINGTON
                                                                                              Torts Division
                                                                                     800 Fifth Avenue, Suite 2000
                                                                                       Seattle, WA 98104-3188
                                                                                          (206) 464-7352

based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment.[116] That is, the deliberate indifference must, at a minimum, "cause [student] to undergo" harassment or "make them liable or vulnerable" to it.[117] Because the harassment must occur "under" "the operations of" a funding recipient,[118] the harassment must take place in a context subject to the school's control and the recipient must respond to known peer harassment in a manner that is not clearly unreasonable.[119]

Moreover, the provision that the discrimination occur "under any education program or activity" suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity.[120] "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, (the *Davis* Court found) it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment."[121] The *Davis* Court observed:

> By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored. Even the dissent suggests that Title IX liability may arise when a funding recipient remains indifferent to severe, gender-based mistreatment played out on a "widespread level" among students.[122]

The Court concluded:

> The fact that it was a teacher who engaged in harassment in *Franklin* and *Gebser*

---

[116] *Id.* at 644-45.
[117] *Id.*
[118] *See* 20 U.S.C. § 1681(a); § 1687 (defining "program or activity").
[119] *Davis*, 526 U.S. at 649.
[120] *Id.* at 652.
[121] *Id.* at 652-653.
[122] *Id.* at 653.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

15

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

is relevant. The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment.[123]

Though deliberate indifference is often a question of fact, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law."[124] The issue is whether, under the governing interpretation of Title IX, the record permits a finding for Plaintiff when all evidence is construed in her favor. Here, the record does not permit such a finding.

### C.     Plaintiff Fails to State a Claim under the Clery Act

There is no private right of action for an alleged violation of the Clery Act.[125] Even if there were a private right of action, Plaintiff presents no evidence the University violated the Clery Act regarding the incidents she experienced. The University thoroughly reviews all reported incidents of discrimination to determine whether they should be included among the crime statistics for the Annual Fire and Safety report.[126] Here, the University's police department carefully reviewed the two incidents Plaintiff reported and determined they did not meet the definitions of "hate crime offenses," under either the 2011 or the 2016 version of the U.S. Department of Education Office of Postsecondary Education's *Handbook for Campus Safety and Security Reporting*.[127]

### D.     Plaintiff Does Not Prove Her Common Law Negligence or Outrage Claims

In addition to her federal causes of action under Title VI and Title IX, Plaintiff alleges two common law claims under Washington law. Such state law claims fall under the court's supplemental jurisdiction.[128] Supplemental jurisdiction expands the subject matter jurisdiction of

---

[123] *Id.*
[124] *Davis*, 526 U.S. at 649.
[125] *See* 20 U.S.C. §1092(f)(14)(A) ("Nothing in this section may be construed to create a cause of action against any institution of higher education or any employee of such an institution for any civil liability….")
[126] Hansen Dec.
[127] *Id.*; *see also* https://www2.ed.gov/admins/lead/safety/handbook.pdf .
[128] 28 U.S.C. § 1367.

the court if there are claims for which the court has original jurisdiction, to include "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...."[129] Supplemental jurisdiction does not, however, abrogate Eleventh Amendment immunity.[130] The University has neither consented to the court's subject matter jurisdiction nor waived Eleventh Amendment immunity for state law claims. Eleventh Amendment immunity applies regardless of the nature of relief the plaintiffs may seek.[131]

### 1. Plaintiff Fails to Present Evidence Establishing Negligence

The existence of a duty is a question of law.[132] Plaintiff does not identify a duty the University owed to her specifically, much less supply evidence the University breached a duty that proximately caused her damages. As a government agency, the University is "normally not liable for alleged breaches of a general duty of care owed to the public at large."[133]

The University's duty, if any, is to the public, not to Plaintiff specifically.[134] The Washington State Supreme Court recognizes four exceptions to this doctrine:

> (1) Where the terms of a legislative enactment evidence an intent to identify and protect a particular and circumscribed class of persons (legislative intent);
>
> (2) where governmental agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and the plaintiff is within the class the statute intended to protect (failure to enforce);
>
> (3) where governmental agents fail to exercise reasonable care after assuming a duty to warn or come to the aid of a particular plaintiff (rescue doctrine);
>
> (4) where a relationship exists between the governmental agent and any reasonably foreseeable plaintiff, setting the injured plaintiff off from the general public and the

---

[129] 28 U.S.C. § 1367(a).

[130] *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999).

[131] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984).

[132] *Johnson v. State*, 77 Wash. App. 934, 937, 894 P.2d 1366 (1995), *review denied*, 127 Wash. 2d 1020, 904 P.2d 299 (1995); *Said Aba Sheikh v. Choe, et al.*, 156 Wash. 2d 441, 128 P.2d 574 (2006).

[133] *Id.*

[134] *Taylor v. Stevens Cty.*, 111 Wash. 2d 159, 759 P.2d 447 (1988); *see also Cummins v. Lewis Cty.*, 156 Wash. 2d 844, 133 P.3d 458 (2006) (special relationship exception).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)                    17                    ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1    plaintiff relies on explicit assurances given by the agent or assurance inherent in a
duty vested in a governmental entity (special relationship).[135]

2

3    Washington courts have also identified and applied a fifth exception where a governmental agency

4    has a custodial "take charge" relationship with an individual, giving rise to the governmental

5    agency's duty to control the actions of the individual.[136]

6    Plaintiff does not allege the University had a duty to "rescue" her from the February 22 and

7    March 29 incidents of discrimination or that the University could have done so, and does not claim

8    the University had a custodial relationship with the two men who racially and sexually insulted her.

9    At best, she appears to argue the University had a duty to provide her with a discrimination-free

10    environment and respond in a different manner to the incidents she experienced. Neither of these

11    allegations is based upon a cognizable duty under the public duty doctrine.

12    <u>Legislative Intent Exception</u>. The duties arising out of government programs typically

13    derive from statute, since agencies are creatures of statute and can only perform the functions

14    permitted by statute or incident thereto.[137] Here, application of the legislative intent exception

15    requires Plaintiff to identify legislation that contains "by its terms . . . a clear intent to identify and

16    protect a particular and circumscribed class of persons."[138] Before this exception can apply, Plaintiff

17    must identify a statute that expresses an intention to protect her from the particular harm that injured

18    her, in this case, racial and sexual insult.[139] Plaintiff alleges the University violated Title VI, Title

19    IX and the Clery Act, but none of those statutes require the University to investigate claims of

20

21

22    [135] *Bailey v. Town of Forks*, 108 Wash. 2d 262, 268, 737 P.2d 1257 (1987) (citing Washington cases and summarizing exceptions to the public duty doctrine).

23    [136] *Taggart v. State*, 118 Wash. 2d 195, 219-20, 822 P.2d 243 (1992) (applying, but not explicitly declaring, a fifth exception to the public duty doctrine, where a custodial relationship exists between a governmental agency and a wrongdoer giving rise to a duty to control the actions of the wrongdoer); *see also Torres v. City of Anacortes*, 97 Wash.

24    App. 64, 79, 981 P.2d 891 (1999) (citing *Taggart* and holding *Taggart* explicitly states a fifth exception).

[137] *Murphy v. State*, 115 Wash. App. 297, 317, 62 P.3d 533 (2003).

25    [138] *Taylor*, 111 Wash. 2d at 164, quoting *Halvorson v. Dahl*, 89 Wash. 2d 673, 676, 574 P.2d 1190 (1978); *see also Johnson*, 77 Wash. App. at 938 ("the legislative intent must be clearly expressed within the provision").

26    [139] *Hartley v. State*, 103 Wash. 2d 768, 698 P.2d 77 (1985).

DEFENDANT'S MOTION FOR    18    ATTORNEY GENERAL OF WASHINGTON
SUMMARY JUDGMENT    Torts Division
(NO.  18-cv-00557RSM)    800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

discrimination in a specific manner.[140] Since the evidence shows the University diligently addressed the effects of the two incidents Plaintiff experienced, and since she identifies no statute creating a duty the University failed to meet, the legislative intent exception has no application.

Failure to Enforce Exception. The "failure to enforce" exception requires that a government agent responsible for enforcing a statutory requirement possess actual knowledge of a statutory violation and fail to take corrective action.[141] For this exception to apply, Plaintiff must prove (1) the University is legally responsible for enforcing a specific statutory requirement and the University had actual knowledge of a violation of that requirement; (2) the University failed to take corrective action; (3) the University had a statutory duty to take such corrective action; and (4) Plaintiff is within the class of persons the statute was intended to protect.[142] Further, the alleged violation must present an immediate risk of harm to Plaintiff, rather than a simple violation of the statute.[143] The statutory duty to act requires a mandatory duty to take a specific action.[144] All four elements must be met for this exception to the public duty doctrine to apply.[145]

The University concedes for the purposes of this motion that Title VI, Title IX and the Clery Act impose statutory requirements that the University take action upon receiving actual knowledge of a violation of those statutes. The failure to enforce exception is nevertheless inapplicable because the University diligently enforced all three of these federal statutory schemes.

There is no factual basis in this record for application of the failure to enforce exception.

---

[140] As stated, Plaintiff must prove the University made what amounts to "an official decision not to remedy the violation." *Oden,* 440 F.3d at 1089. The law does not require a specific type of response. *See also Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165 (1st Cir. 2007) (Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or adopt strategies advocated by parents; courts are not to second-guess an educational institution's choices "from within a universe of plausible investigative procedures;" and quoting from *Porto v. Town of Tewksbury,* 488 F.3d 67, 73 (1st Cir.2007), that "'a claim that the school system could or should have done more is insufficient to establish deliberate indifference.'")

[141] *Bailey*, 108 Wash. 2d at 268.

[142] *Smith v. State*, 59 Wash. App 808, 802 P.2d 133 (1990).

[143] *McKasson v. State*, 55 Wash. App. 18, 776 P.2d 971 (1989).

[144] *Forest v. State*, 62 Wash. App. 363, 369-70, 814 P.2d 1181 (1991).

[145] *Atherton Condo v. Blume*, 115 Wash. 2d 506, 799 P.2d 250 (1990).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)

19

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

Special Relationship Exception. As a matter of law, the University does not have a special relationship with its students recognized by the public duty doctrine.[146] The doctrine of *in loco parentis* does not apply to university students.[147] "A special relationship is created by direct contact or privity with a public official or agency accompanied by express assurances made by the public official upon which the plaintiff reasonably relies."[148] An "express assurance" arises only where "a direct inquiry is made by an individual and incorrect information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment."[149] There is no evidence in the record to prove unmet express assurances.

Moreover, Plaintiff enrolled at the University because "the community seemed amazing" and her "grandmother went there," not because of any assurances specifically given to her by the University.[150] She attended the University because she "fell in love with the campus as a whole."[151] Plaintiff does not supply evidence to establish this exception to the public duty doctrine.

### 2.   Plaintiff Fails to Present Evidence Establishing Outrage

"The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability."[152] Only if the court makes that determination is there a jury question whether the conduct is sufficiently outrageous.[153] Plaintiff supplies no evidence the University intentionally or recklessly inflicted emotional distress upon her in its myriad responses to the incidents of discrimination she experienced, much less engaged in "extreme and outrageous conduct" in doing so. Proof of outrage requires (1) extreme and

---

[146] *Johnson*, 77 Wash. App. at 940.
[147] *Id.* at 939.
[148] *Johnson*, 77 Wash. App. at 939; *Beal v. City of Seattle*, 134 Wash. 2d 769, 785, 954 P.2d 237 (1998).
[149] *Burnett v. Tacoma City Light*, 124 Wash. App. 550, 563-64, citing *Babcock v. Mason Cty. Fire Dist.*, 144 Wash. 2d 774, 789, 30 P.3d 1261 (2001).
[150] Triesch Decl., Exh. 1, p. 161:21-24.
[151] *Id.*
[152] *Dicomes v. State*, 113 Wash. 2d 612, 630, 782 P.2d 1002 (1989); *Robel v. Roundup Corp.*, 148 Wash. 2d 35, 51, 59 P.3d 611 (2002); *Strong v. Terrell*, 147 Wash. App. 376, 385, 195 P.3d 977 (2008).
[153] *Id.*

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO.  18-cv-00557RSM)

20

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff.[154] The Washington State Supreme Court has emphasized the high level of evidentiary proof required to establish this tort:

> First, the emotional distress must be inflicted *intentionally or recklessly;* mere negligence is not enough. Second, the conduct of the defendant must be *outrageous and extreme* . . . . Liability exists 'only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'.*[155]

The evidence does not meet this high burden. Dismissal of this claim, too, is proper.

## VIII.   CONCLUSION

Based on the foregoing facts, argument and authorities, there is no genuine issue of material fact for a jury to decide. Summary judgment of dismissal is appropriate.

DATED this 2nd day of January 2019.

ROBERT W. FERGUSON
Attorney General

*s/ Paul Triesch*
PAUL TRIESCH, WSBA No. 17445
Assistant Attorney General
800 5th Ave., Suite 2000; Seattle, WA 98104
Tel: 206-464-7352; Fax: 206-587-4229
Email: Pault@atg.wa.gov
Attorneys for Defendant Washington State University

---

[154] *Dicomes*, 113 Wash. 2d at 630 (citing *Rice v. Janovich*, 109 Wash. 2d 48, 61, 742 P.2d 1230 (1987)).
[155] *Grimsby v. Samson*, 85 Wash. 2d 52, 59-60, 530 P.2d 291 (1975) (emphasis original) (citing Restatement (Second) of Torts § 46 (1965)).

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
(NO. 18-cv-00557RSM)

21

ATTORNEY GENERAL OF WASHINGTON
Torts Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1

**DECLARATION OF SERVICE**

2     I declare that on this 2nd day of January 2019, I caused to be electronically filed the

3 foregoing document with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the following:

5     Anne Bremner: abremner@freybuck.com

6     I declare under penalty of perjury under the laws of the state of Washington that the

7 foregoing is true and correct.

8     DATED this 2nd day of January 2019, in Seattle, Washington.

9
                                           *s/ Nerissa Tigner*
10                                          NERISSA TIGNER – Legal Assistant
                                           800 Fifth Ave Suite 2000; Seattle, WA 98104
11                                          Tel: 206-464-7352; Fax: 206-587-4229
                                           Email: NerissaR@ATG.WA.GOV
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26