1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT SEATTLE

10   DOMINIQUE STEWART, an individual,          Case No. C18-557-RSM
11
                    Plaintiff,                   ORDER GRANTING MOTION FOR
12                                               SUMMARY JUDGMENT
13                    v.
14   WASHINGTON STATE UNIVERSITY, a
     state educational institute,
15
16                    Defendant.

17          This matter comes before the Court on Defendant Washington State University

18   ("WSU")'s Motion for Summary Judgment.  Dkt. #26.  Plaintiff Dominique Stewart opposes.
19
20   Dkt. #32.  WSU also moves to strike certain declarations and exhibits attached to Ms. Stewart's

21   opposition.  Dkt. #36.  Oral argument was heard on March 21, 2019.  Dkt. #52.  For the reasons

22   stated below, the Court GRANTS WSU's Motion and finds that WSU's Motion to Strike is

23   moot.[1]

24                          I.      BACKGROUND
25
26          Plaintiff Stewart was enrolled at WSU from the Fall of 2014 to Spring of 2018.  Dkt.

27   #27-1 ("Plaintiff Dep."), 10:3-14, 168:14-24.  She is African-American.  Dkt. #3 at ¶3.2.

28   ─────────────────────
     [1] The Court has determined that this Motion is moot because the Court can grant WSU's Motion even if it
     considered the objectionable evidence presented by Ms. Stewart.

     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 1

The night of Saturday, February 21, 2015, Ms. Stewart and several of her friends went to an event at the Phi Delta Theta fraternity located off-campus. Dkt. #31-1, Ex. 1, ¶ 1. In the early morning hours of February 22, 2015, a white male student who was a member of the fraternity confronted Ms. Stewart while she was waiting for her friends to exit the house. Dkt. #31-1 at 37. According to Ms. Stewart, this student said "why are all these nigger bitches around my house," and later "I said, get the fuck away from me you nigger bitch." *Id*. He then slammed the door on her.

On Monday, February 23, Ms. Stewart met with members of Phi Delta Theta and identified the white male as a member of the fraternity; he was then kicked out of the fraternity. *See* Plaintiff Dep. at 39:10-20, 44:23-48:24.

By Tuesday, February 24, the University's Interim Vice President for Student Affairs, Melynda Huskey, learned of the incident and assembled a team of WSU administrators to respond. *See* Dkt. #31 at ¶9. Dr. Huskey took several actions that day. *See* Dkt. #31-1. Both the University's Office for Equal Opportunity ("OEO") and the University's Office of Student Conduct began to investigate the incident. Dr. Huskey facilitated a meeting between the President of the University's Black Student Union, the Phi Delta Theta fraternity president, the Associate Director of the SMART START Program/Retention Counselor and African American Student Center, Donna Arnold, and other University administrators. *See id.*

On February 25, 2015, approximately 100 students, including Ms. Stewart, held a one-hour silent rally on campus to raise awareness about "racism, classism, sexism, ableism, gender discrimination, religious discrimination, etc…" *See* Plaintiff Dep. at 61:7-65:10, 74:16-25. After this event, Ms. Stewart alleges she experienced backlash on social media, including racial

and sexist slurs. Dkt. # 32 at 4. She maintains that she sought assistance from WSU in dealing with this harassment and was provided with none. *Id.*

On March 2, 2015, Dr. Huskey met with Ms. Stewart and her mother. Dkt. #34 at ¶ 15. At that meeting, Ms. Stewart's mother requested that the University provide Ms. Stewart with a new dormitory room closer to the Student Recreation Center and her classes. *Id.* Dr. Huskey agreed to do so. *Id.*

On March 5, 2015, Dr. Huskey provided Ms. Stewart and her mother with a written resource guide detailing several sources of University assistance to address the effects of the February 22 incident. *Id.* at ¶ 18. Those resources included counseling and testing services, health and wellness services, accommodation services, and emergency services. *Id.*

Dr. Huskey also provided Ms. Stewart the names of two additional University officials who could meet with her: Donna Arnold, the Director of the University's African-American Student Center, and Karen Fischer, the University's Associate Dean of Students. *Id.* at ¶ 19. Dr. Huskey ensured that Ms. Arnold could meet with Ms. Stewart and provide perspective and support. *Id.* at ¶23. Thereafter, Ms. Stewart had "a couple of" meetings with Ms. Arnold. Plaintiff Dep. at 108:25-109:7, 154:10-13. Ms. Stewart also met with Dean Fischer "a couple of times." *Id.* at 105:5-8, 106:18-22.

On March 10, 2015, the Phi Delta Theta fraternity underwent mandatory diversity/sensitivity training. Dkt. #28 at 2; Plaintiff's Dep. at 159:12-15. This training was conducted by the Director of Diversity Education, Jeff Guillory. *Id.* Members of the fraternity were also required to undergo separate bystander intervention training. Dkt. #31 at ¶ 13.

On March 29, 2015, Plaintiff Stewart was walking off-campus when a car full of unidentified males drove by, and one of them threw a chicken nugget at her while shouting

"nigger THOT![2]" Plaintiff Dep. at 135:1-22. The Pullman police department contacted Ms. Stewart, but she could not identify the individuals in the vehicle as students or otherwise, and she could not provide a license plate number for the vehicle. *Id*. at 144:7-20, 145:22-146:17. The WSU police contacted Pullman police to follow up on this incident. Dkt. #30 at ¶ 5. The Pullman police department located a vehicle that matched the vehicle Ms. Stewart described, but determined after investigation the individuals associated with the vehicle were not involved in the March 29 incident. *Id*.

On April 2, 2015, Ms. Stewart met with WSU's President, Elson Floyd. Plaintiff Dep. at 98:22-99:11. Other individuals at this meeting included Jeff Guillory and Ms. Stewart's female friends who had been present at the Phi Delta Theta incident. The purpose of this meeting was to discuss the incident at Phi Delta Theta on February 22.

The parties hotly contest how to characterize this discussion, which was surreptitiously recorded by Ms. Stewart. For purposes of this Motion, the Court can rely on Ms. Stewart's characterization and transcript of this meeting. Ms. Stewart asserts Mr. Floyd stated that he had "no jurisdiction" over the Phi Delta Theta and other fraternities off campus. *See* Dkt. #32 at 4. The transcript submitted by Ms. Stewart indicates Mr. Floyd stated that he wanted to get jurisdiction over the fraternities, but "as president, I don't have any control over it." Dkt. #33-1 at 30-33. Ms. Stewart also argues that Mr. Floyd and Mr. Guillory "used the occasion to shame the victims for socializing with Caucasians at fraternities." Dkt. #32 at 4.

Ms. Stewart and her mother had further meetings with Dr. Huskey, the WSU chief of police, and other university staff that same day. Dkt. #31-1 at 30–32; Plaintiff Dep. at 109:8-110:1. Ms. Stewart's mother requested 24-hour police security for her daughter, but this was declined for lack of resources. Dkt. #30 at 2. At the conclusion of these meetings, Dr. Huskey

---

[2] As understood by Plaintiff, this is an offensive acronym for "that ho over there." *See* Dkt. #32 at 4.

provided Ms. Stewart with referral information for the Student Counseling Center, Health and Wellness Center, Access Center, and Pullman Police Department. Dkt. #31-1 at 34. Dr. Huskey discussed options for Ms. Stewart to withdraw from some courses or even to withdraw from the university altogether. *Id.*

After the April 2 meeting, President Floyd authorized Mr. Guillory to hire DaVina Hoyt to support and provide leadership development opportunities to Ms. Stewart and the other women who were present at the fraternity. *See id.* at 32.

On April 9, 2015, the OEO completed its investigation, which concluded that the student who had insulted Ms. Stewart on February 22 violated WSU's policy prohibiting discrimination. Dkt. #31-1 at 37–56. The OEO sent the report to the University's Office of Student Conduct. On April 30, 2015, the Office of Student Conduct concluded the student who racially and sexually insulted Ms. Stewart on February 22 violated WSU's student conduct standards. Dkt. #31 at 8. WSU then expelled him. *Id.* The student went through an appeals process and WSU upheld the expulsion. *Id.*; Dkt. #31-1 at 63–65. Ms. Stewart is aware of the student's expulsion, appeal, and WSU upholding the expulsion. Plaintiff Dep. at 129:22-130:9.

Ms. Stewart graduated from the University in the Spring of 2018 with a 3.1 grade point average. *Id.* at 168:14–169:4.

Plaintiff Stewart filed this case on April 16, 2018. Dkt. #1. Her Amended Complaint states the following causes of action: violation of Title VI (40 U.S.C. § 2000d), violation of Title IX (20 U.S.C. § 1681), violation of the Clery Act (20 U.S.C. § 1092), and the common law torts of outrage and negligence. Dkt. #3.

## II.    DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.  Analysis

#### 1.  Title VI and Title IX Claims

The Court will first address Ms. Stewart's Title VI and Title IX claims. *Davis Next Friend. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661 (1999) sets forth the basic standard for such claims:

> [F]unding recipients are properly held liable in damages where they are: (1) deliberately indifferent, (2) to [] harassment, (3) of

which they have actual knowledge, (4) that is so severe, pervasive, and objectively offensive, (5) that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*S.S. v. Alexander*, 143 Wn. App. 75, 99, 177 P.3d 724, 736 (2008) (citing *Davis*, 526 U.S. at 650, 119 S.Ct. 1661)). "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

There is no dispute that WSU qualifies as a funding recipient under the above statutes. The parties appear to agree that the record supports the second through fifth prongs above, or at least that there are genuine disputes as to material facts for these prongs. *See* Dkt. #37 at 1 n.1. The real dispute before the Court is whether Ms. Stewart has made a sufficient showing that WSU was "deliberately indifferent" to the harassment above to survive summary judgment. *See Celotex, supra.*

"Funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Mercer Island Sch. Dist. v. Office of the Superintendent of Pub. Instruction*, 186 Wn. App. 939, 971, 347 P.3d 924 *review denied sub nom. Mercer Island Sch. Dist. v. N.W. ex rel. B.W.*, 184 Wn.2d 1024, 361 P.3d 746 (2015) (quoting *Davis*, 526 U.S. at 648). Deliberate indifference requires an "official decision... not to remedy the situation." *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Davis and Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). Further, "an aggrieved party is not entitled to the precise remedy that he or she would prefer." *Id*.

*S.S. v. Alexander* lists a broad range of insufficient and/or unreasonable responses to peer-on-peer harassment: failure to properly investigate, failure to notify law enforcement, failure to meaningfully and appropriately discipline the student-harasser, minimization of the discriminatory import of the harassment, etc. WSU highlights in its Reply brief why *Alexander* is factually distinct from what happened in this case. *See* Dkt. #37 at 9. In *Alexander*, a female student at the University of Washington, S.S, was raped and harassed by her former boyfriend, who was a player on the UW football team. 143 Wn. App. at 85. S.S. was also employed by the UW as an assistant equipment manager for the football team. After reporting the incident, she was approached by the UW's associate athletic director and it was suggested that she transfer away from her position with the team. *Id.* at 86. She was told that if she revealed she was raped by a member of the team, "it would reflect poorly on the University of Washington's handling of the situation." *Id.* When S.S. suggested she file a police report, she was told to wait. UW's designated Title IX compliance officer and other officials decided to conduct a mediation between S.S. and her alleged rapist. *Id.* at 87. No other options were presented to S.S. During the mediation, S.S. expressed her desire that the alleged rapist be suspended from participation in several football games. *Id.* at 88. In response, the alleged rapist denied S.S.'s allegations and threatened to leave the UW if he were suspended from any football games. *Id.* UW's assistant athletic director refused to consider suspending the alleged rapist, stating that the media "would ask why he was not playing." *Id.* At the conclusion of the mediation, UW's representatives decided that the alleged rapist would undergo counseling and perform community service. *Id.* S.S. was not satisfied with this outcome, but was essentially told by UW representatives that the matter was closed. The *Alexander* court found a genuine issue of material fact existed regarding the issue of deliberate indifference. 143 Wn. App. at 106.

WSU argues here that they did the "direct opposite" of the UW by not treating the offending student and Plaintiff Stewart equally, by immediately investigating Ms. Stewart's claim through the OEO and the Office of Student Conduct, by working with the Pullman police department, and by actually expelling the student-harasser. Dkt. #37 at 9.

Plaintiff Stewart argues that WSU "chose a limited response to only the first of two attacks separated by barely more than a month," and that it "absolved itself of responsibility to investigate the chicken-throwing incident of March 29, ostensibly due to 'jurisdictional' questions, despite the fact that the incident, like the attack at the fraternity, occurred on WSU's own Greek Row and within its jurisdiction." Dkt. #32 at 11. Ms. Stewart maintains that "University President Floyd and Director Guillory personified deliberate indifference, minimizing the harassment, disavowing responsibility for Greek Row, and blaming the women for being where they 'did not belong.'" *Id.* at 12.

At oral argument, Ms. Stewart's counsel argued that WSU did not take steps to prevent Ms. Stewart and the alleged harasser from crossing on campus, that the investigation did not proceed quickly enough, that WSU did not help Ms. Stewart academically, and that WSU failed to adequately investigate the March 29 incident by looking for surveillance footage or interviewing potential witnesses.

After considering all of the above, the remainder of the parties' briefing, and the parties' positions during oral argument, the Court agrees with WSU that its actions here stand in stark contrast to the actions of the University of Washington in *S.S. v. Alexander*. WSU's response may have been far from perfect, but it does not rise to the level of deliberate indifference. A few statements from President Floyd that could be characterized as indifference are insufficient to create liability for WSU.

Title VI and Title IX look to the response from the institution. Ms. Stewart has been unable to point to any facts in this case that cast WSU's *response* as deliberately indifferent—*i.e.*, that show WSU's response or lack thereof was clearly unreasonable in light of the known circumstances. Ms. Stewart's Amended Complaint challenges WSU's responses to two incidents—the February 22 incident at the fraternity and the March 29 chicken-throwing incident.[3] Dkt. #3. Whether or not WSU was being sufficiently genuine in its motivations, as potentially reflected in President Floyd's comments, it is undisputed that WSU promptly investigated the February 22 incident and disciplined the student-harasser with expulsion. It is unclear what more WSU could have done to deal with that incident while affording due process to the harassing student. The record demonstrates WSU and its campus police force were aware of the March 29 incident, determined that the Pullman police department was investigating, but that the police and Ms. Stewart were ultimately unable to identify the harassing individuals involved. In addition to investigations, WSU provided Ms. Stewart with at least some access to counseling services, and made at least some attempt to accommodate Ms. Stewart's requests. WSU was not required to provide Ms. Stewart with the remedies she would have preferred. *See Oden,* 440 F.3d at 1089.

Ms. Stewart's strongest evidence of deliberate indifference comes from the meeting with President Floyd's on April 2, 2015. However, even if the Court assumes the alleged statements were made by Mr. Floyd, those statements cannot outweigh the *actions* of WSU. No reasonable jury could conclude that WSU's *response* to these two incidents demonstrates deliberate

---

[3] During oral argument, Ms. Stewart's counsel argued there were actually three or even four incidents, including the above two incidents, but also the social media harassment and the meeting with President Floyd. The Court finds that Ms. Stewart has argued outside the scope of her pleadings, but in any event these two additional "incidents" do not create a question of fact as to WSU's deliberate indifference because Ms. Stewart was unable to present admissible evidence that WSU had actual knowledge of the online harassment and made an official decision not to remedy the situation, or that Mr. Floyd's comments in the one meeting constitute harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive Ms. Stewart of access to the educational opportunities or benefits provided by the school.

indifference, even if President Floyd's commentary on the incidents (or on WSU's ability to respond to the incidents) could be interpreted as showing indifference, minimizing the harassment, or casting blame on Ms. Stewart for being at the fraternity. WSU's actions spoke louder than words.

## 2. Clery Act, Negligence, and Outrage Claims

WSU points out that there is no private right of action for a violation of the Clery Act. Dkt. #37 at 10 (citing 20 U.S.C. §1092(f)(14)(A)). This claim will be dismissed.

With regard to Ms. Stewart's negligence claim, WSU argues that "the evidence shows the University comprehensively addressed the two incidents of discrimination Plaintiff experienced, whether or not it met Plaintiff's expectations," and that "there is no evidence of a breach of duty that proximately caus[ed] Plaintiff's alleged damages." Ms. Stewart argues she can proceed on her negligence claim despite the Public Duty Doctrine because WSU violated Title VI, Title IX, and the Clery Act. *See* Dkt. #32 at 20-21. The Court has already found that WSU did not violate Title VI and Title IX as a matter of law, and Ms. Stewart has failed to make a sufficient showing that WSU's alleged violation of the Clery Act could have proximately caused her damages. Accordingly, the Court finds no basis for the negligence claim to survive summary judgment.

Turning to outrage, this tort requires three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195-196, 66 P.3d 630 (2003). These elements were adopted in Washington State from the *Restatement (Second) of Torts* § 46 (1965) in *Grimsby v. Samson*, 85 Wn.2d 52, 59-60, 530 P.2d 291 (1975). Grimsby further held that any claim for intentional infliction of emotional distress must be predicated on

behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 85 Wn.2d at 59 (quoting *Restatement (Second) of Torts* § 46 cmt. d).

Ms. Stewart points solely to the April 2, 2015, meeting with President Floyd as the source of her outrage claim. *See* Dkt. #3 at 8; Dkt. #32 at 21–22. WSU characterizes that meeting as "little more than a personal, quasi-parental expression of advice and perspective from two male African-American University leaders to female African-American students who had experienced racism and sexism." *Id.* at 12. The Court need not determine whether WSU's characterization or Ms. Stewart's characterization of this meeting is correct. The Court finds Ms. Stewart has, as a matter of law, failed to point to conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. The Court will dismiss this last claim on summary judgment as well.

### III.    CONCLUSION

Having reviewed the relevant briefing, attached declarations, and the remainder of the record, the Court hereby finds and ORDERS that Defendant Washington State University's Motion for Summary Judgment, Dkt. #26, is GRANTED. WSU's Motion to Strike, Dkt. #36, is DENIED AS MOOT. All of Plaintiff Stewart's claims are DISMISSED. This case is CLOSED.

DATED this 26 day of March, 2019.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE